CHARLES A. BONNER, ESQ.  SB# 85413
A. CABRAL BONNER, ESQ. SB# 247528
**LAW OFFICES OF BONNER & BONNER**
475 GATE FIVE ROAD, SUITE 212
SAUSALITO, CA 94965
TEL: (415) 331-3070
FAX: (415) 331-2738
cbonner799@aol.com
cabral@bonnerlaw.com

ATTORNEYS FOR PLAINTIFFS

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

DENNIS SONG, DDS, MD, and
TINA VALARIS

        Plaintiffs,

    vs.

THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA; DR. BRIAN BAST, *In His
Individual Capacity,* DR. JOHN
FEATHERSTONE, , *In His Individual
Capacity,* and DOES 1-50, inclusive,

        Defendants.

**Case No.:**

**COMPLAINT FOR DAMAGES:**

**FEDERAL CLAIMS:**
1. DEPRIVATION OF FIRST
   AMENDMENT RIGHT OF FREE
   PUBLIC CONCERN SPEECH
2. RETALIATION IN VIOLATION OF
   CIVIL RIGHTS 42 U.S.C. § 1983
   MONEL ACTION
3. RETALIATION IN VIOLATION OF
   CIVIL RIGHTS DEPRIVATION OF
   PROPERTY AND DUE PROCESS
   IN VIOLATION OF FOURTEENTH
   AMENDMENT U.S.C. § 1983

**STATE CLAIMS:**
4. 12.  VIOLATION CALIFORNIA LABOR
   CODE SECTION 1102.5
5. RETALIATION IN VIOLATION OF
   HEALTH & SAFETY CODE SECTION
   1278.5
6. INTENTIONAL INFLICTION OF
   EMOTIONAL DISTRESS
7. GOVERNMENT CODE SECTION 815.2
   NEGLIGENCE  GOVERNMENT CODE
   SECTION 815.2
PUNITIVE DAMAGES

COMPLAINT FOR DAMAGES

1

**JURY TRIAL DEMANDED**

PLAINTIFF DENNIS SONG, DDS, MD, and TINA VALARIS, allege against DEFENDANTS as follows:

1.  PLAINTIFFS DENNIS SONG, DDS, MD (hereinafter "DR. SONG") is an adult natural person who is and was at all times relevant to this Complaint, a resident of San Francisco County, State of California.

2.  PLAINTIFF TINA VALARIS (hereinafter "MS. VALARIS")  is an adult natural person who is and was at all times relevant to this Complaint, a resident of San Francisco County, State of California.

3.  DEFENDANT THE REGENTS OF THE UNIVERSITY OF CALIFORNIA operating as the UNIVERSITY OF CALIFORNIA SAN FRANCISCO, SCHOOL OF DENTISTRY (hereinafter "UCSF" or "EMPLOYER") is a governmental entity.

4.  DEFENDANT BRIAN BAST, *In His Individual Capacity*, (hereinafter "DR. BAST") is an individual employed by UCSF. At all relevant times, DEFENDANT BRIAN BAST is and was the Chair of the Department of Maxillofacial Surgery, a managing agent of the THE REGENTS OF THE UNIVERSITY OF CALIFORNIA.

5.  DR. JOHN FEATHERSTONE, *In His Individual Capacity*, is an individual employed by UCSF. At all relevant times, DEFENDANT DR. JOHN FEATHERSTONE is and was the Dean of the Department of Maxillofacial Surgery, a managing agent of the THE REGENTS OF THE UNIVERSITY OF CALIFORNIA.

6.  PLAINTIFFS are informed, believe, and thereon allege that at all relevant times, each DEFENDANT was an employer, was a principal, managing agent, partner, joint venture, officer, director, controlling shareholder, subsidiary, affiliate, parent corporation, successor in interest and/or predecessor in interest of some or all of the other DEFENDANTS, and was engaged with some or all of the other DEFENDANTS in a joint enterprise for profit, and bore such other

COMPLAINT FOR DAMAGES

relationships to some or all of the other DEFENDANTS so as to be liable for their conduct with respect to the matters alleged in this complaint.

7.  PLAINTIFFS are informed, believe, and thereon allege that each DEFENDANT acted pursuant to and within the scope of the relationships alleged above, and that at all relevant times, each DEFENDANT knew or should have known about, authorized, ratified, adopted, approved, controlled, and/or aided and abetted the conduct of all other DEFENDANTS. As used in this complaint, "DEFENDANT" means "DEFENDANTS and each of them," and refers to the DEFENDANTS named in the particular cause of action in which the word appears.

8.  At all times mentioned herein, each DEFENDANT was the co-conspirator, agent, servant, employee, and/or joint venture of each of the other DEFENDANTS and was acting within the course and scope of said conspiracy, agency, employment, and/or joint venture and with the permission and consent of each of the other DEFENDANTS.

9.  PLAINTIFFS are informed, believe, and thereon allege that at all times mentioned in this Complaint, DEFENDANTS were the agents and employees of their CO-DEFENDANTS, and in doing the things alleged in this Complaint were acting within the course and scope of their agency and employment and acted in such a manner as to ratify the conduct of their CO-DEFENDANTS.

## JURISDICTION AND VENUE

10. PLAINTIFFS bring this action pursuant to the laws of the United States of America. Jurisdiction is founded upon 28 U.S.C. § 1331, as this case involves federal questions of law.

11. Venue is proper in this judicial district because PLAINTIFFS' injuries, damages and harms, including the violation of PLAINTIFFS' civil rights, occurred in this judicial district. Further, one or more of the DEFENDANTS reside, are headquartered and conduct business in this judicial district. DEFENDANTS are subject to suit in this Judicial District and regularly employ 15 or more persons.

## GENERAL ALLEGATIONS

12.  PLAINTIFFS allege that DEFENDANT THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, operating as the    UNIVERSITY OF CALIFORNIA SAN FRANCISCO,

COMPLAINT FOR DAMAGES

SCHOOL OF DENTISTRY (hereinafter "UCSF" or "EMPLOYER"), DEFENDANT DR. JOHN FEATHERSTONE (hereinafter, DEFENDANT DR. FEATHERSTONE), and DEFENDANT BRIAN BAST (hereinafter, DEFENDANT DR. BAST), through DEFENDANT Employer's managing agents, discriminated and retaliated against PLAINTIFFS for engaging in protected activity, including their complaints regarding DEFENDANTS' patients safety, patient substandard care, substandard conditions of the dental school, clear and present danger to patients due to incompetence surgeon providing general anesthesia and doing surgery at the same time; complaints regarding UCSF intentionally refusing to refund to patients excess payments. At all relevant times, PLAINTIFFS were employees and medical providers of DEFENDANTS, acting in the normal course and scope of employment duties with DEFENDANTS.

## PARTIES

13.  PLAINTIFF DR. SONG is a citizen of the United States of America and is a resident of San Francisco, CA. At all times herein relevant, DR. SONG was a attending surgeon and an employee as a ten (10) year volunteer professor of dentistry at DEFENDANT UCSF SCHOOL OF DENTISTRY, as well as an active financial donor to the school.

14.  PLAINTIFF MS. VALARIS is a citizen of the United States of America and is a resident of San Francisco, CA. At all times herein relevant, MS. VALARIS was an employee as the Manager of the Department of Oral & Maxillofacial Surgery at DEFENDANT UCSF SCHOOL OF DENSTRY.

15.  DEFENDANT UCSF is a Division of the Government of the State of California and is incorporated under the Laws of the State of California. DEFENDANT UCSF does business in the City of San Francisco under the business name University of California San Francisco. UCSF is located at 707 Parnassus Ave, San Francisco, CA 94143, and the DEFENDANT THE REGENTS OF THE UNIVERSITY OF CALIFORNIA's business mailing address is 1111 Franklin Street, 12th Floor, Oakland, CA 94607.

16.  DEFENDANT DR. JOHN FEATHERSTONE is a citizen of the United States of America and is a resident of San Francisco, CA. At all times herein relevant, DEFENDANT DR. FEATHERSTONE was a managing agent of DEFENDANT UCSF.

COMPLAINT FOR DAMAGES

4

17.   DEFENDANT DR. BRIAN BAST is a citizen of the United States of America and is a resident of San Francisco, CA. At all times herein relevant, DEFENDANT BRIAN BAST was and is a managing agent of DEFENDANT UCSF.

<strong><u>DOE DEFENDANTS</u></strong>

18.   PLAINTIFFS do not know the true names and capacities, whether individual, corporate, associate, or otherwise of DEFENDANT DOES 1 through 50 inclusive, and therefore sue these DEFENDANTS by such fictitious names. PLAINTIFFS will seek leave to amend his complaint to allege their true names and capacities when the true names and capacities have been ascertained.

<strong><u>RESPONDEAT SUPERIOR</u></strong>

19.   All of the described conduct, acts, and failures to act are attributed to agents and managing agents of DEFENDANT UCSF. Said acts, conduct, and failures to act were within the scope of such agency and employment. At all times relevant herein, each participant was acting within the course and scope of his or her employment and agency.

20.   Each DEFENDANT, at all relevant times, was acting as the agent and co-conspirator of the other, and each endorsed, ratified, encouraged, agreed with, and took overt acts to carry out and accomplish the illegal conduct, activities and schemes alleged herein. All illegal conduct by managing agents was endorsed, ratified, encouraged and agreed to by each DEFENDANT and was foreseeable, and DEFENDANTS, and each of them, had prior knowledge of said illegal conduct, rendering DEFENDANT EMPLOYER vicariously liable. DEFENDANTS are individually liable for the acts and omissions of each other, based on the facts that each DEFENDANT endorsed, ratified, encouraged, conspired and agreed to the illegal conduct as herein alleged.

21.   DEFENDANT UCSF's Executive Leadership Team and Board Members, and each of them, intentionally, willfully, and negligently failed to provide any oversight over DEFENDANT UCSF and its managing agents to ensure compliance with all Federal and State laws, including, but not limited to, laws mandating the timely, correct payment and record-keeping of employees' wages; laws mandating that employees work in an environment free of discrimination; and laws

mandating that employers refrain from retaliating against employees who participate in protected activity, such as employees complaining about the untimely and inaccurate payment of wages. DEFENDANT UCSF's Executive Leadership Team and Board Members, and each of them, willfully failed to promptly collect and withhold taxes; and failed to pay and failed to withhold income and employment taxes, including social security taxes, and other Federal Payroll tax requirements.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

22.  PLAINTIFFS have exhausted administrative remedies by filing charges of retaliation with UCSF, and with appropriate federal and state agencies, including the EEOC and the DFEH. Further, PLAINTIFFS will file an amendment to this lawsuit within the statutory period following the issuance of the Right-to-Sue Letters from the EEOC and DFEH.

## WORKERS' COMPENSATION EXCLUSIVITY DOES NOT APPLY

23.  Each and every wrongful, injurious, intentional, willful, discriminatory, harassing act and failure to act by DEFENDANTS were not normal incidents of employment and were outside the scope of the employment bargain.  Thus, the Workers' Compensation exclusive remedy set forth in California Labor Cod § 3600 et seq. will not preempt or bar PLAINTIFFS'  right to recover for damages set forth herein.

## DAMAGES

24.  As a direct and legal result of DEFENDANTS' conduct as set forth herein, PLAINTIFFS have suffered, and continue to suffer, substantial losses in earnings, significant loss of reputation, severe mental, and emotional distress, humiliation, loss of enjoyment of life, misery, inconvenience, anxiety, discomfort, fear, and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, loss of future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

## DR. SONG'S STATEMENT OF FACTS

25.  On or about July 30, 2007, DEFENDANTS Appointed DR. SONG as an Assistant Clinical Professor, a volunteer position, evidenced by an Appointment Letter.

COMPLAINT FOR DAMAGES

26.  On or about July 1, 2012, DEFENDANTS provided to DR. SONG an Accelerated Promotion to Associate Clinical Professor, evidenced by an Appointment Letter.

27.  DR. SONG was a clinical professor at UCSF for ten years, teaching in the pre-doctoral program, instructing and lecturing to pre-doctoral students and residents in the pediatric dentistry and oral surgery residency programs. DR. SONG also taught a resident teaching curriculum, where he instructed residents on how to teach. DR. SONG based this curriculum on his teaching fellowship program that he did while an oral surgery resident with the School of Medicine. Additionally, DR. SONG taught clinical teaching to third and fourth-year students who were doing surgery. He also was the supervising surgeon or attending surgeon for the entire duration of that time. Further, DR. SONG gave four (4) lectures per year for the oral surgery department, two on nitrous oxide, and two on basic oral surgery for students.  He also taught in the division of pediatric dentistry, teaching three (3) classes annually, as well as teaching how to do surgery and treatment of various aspects of pediatric dentistry. DR. SONG shouldered quite a workload for DEFENDANTS UCSF.

28.  On August 7, 2015, DEFENDANT DEAN FEATHERSTONE invited DR. SONG to serve on his Dean's Council. This communication is confirmed in an email dated 08/07/2015.

**DR. SONG'S COMPLAINTS OF SUBSTANDARD PATIENT CARE, CONDITIONS OF THE FACILITY, AND THREATS TO PATIENT SAFETY**

29.      On May 7, 2015 DR. SONG initiated a meeting and met with Dr. Anthony Pogrel, the previous and transiting Chair of the Department, to discuss concerns about patient care and safety and other problems in the department, seeking help to correct those issues and concerns. This meeting was confirmed in an email. Following this meeting, DEFENDANTS failed to take any corrective action.

COMPLAINT FOR DAMAGES

30.     On June 3, 2015, DEFENDANTS' clinical department professors and manager informed DR. SONG in an email communication that his performance and student evaluations were excellent.

31.     On June 16, 2015, DR. SONG met with DEFENDANT DEAN FEATHERSTONE to discuss possible paying positions in administration, with the expressed goal of addressing and correcting many of the substandard patient safety concerns.  Following this meeting, DEFENDANTS failed to take any corrective action.

32.     During June 2015, another medical provider, Dr. Berger, in an email on June 8, 2015, reported problems of patient care and safety and problems with students being inadequately trained in the clinic.

33.     During the year of 2016 through 2017, DR. SONG complained to management about substandard patient care, substandard conditions of the dental school and threats to patient safety. He communicated descriptive details of these complaints to DEFENDANTS BAST, FETHERSTONE, and to the chancellor via several emails.  He complained of serious and various substandard patients' care. He explained that students' documentation and charting were extremely poor, disrupting the continuity of patient care, emphasizing that due to this lack of proper charting there was no way to know what had happened during previous patients' visits. He emphasized that the continuity of patient care absolutely depends upon through and adequate charting. DEFENDANTS ignored these complaints and failed to make changes to protect patient safety.

34.     On May 8, 2016, DR. SONG, via email, informed DEFENDANTS DR. BAST and DR. FEATHERSTONE of problems, patient risks, and safety issues in the clinic and department.

COMPLAINT FOR DAMAGES

35.      On October 5, 2016, DR. SONG communicated by email to Dr. Thuan Le, head of the residency program in the Pediatric Dentistry Division of his interest in teaching in the Pediatric Dentistry Division.

36.      On April 5, 2017, Dr. Perkins, faculty and clinic manager, admitted and confirmed the many complaints, from DR. SONG and other doctors and staff,  that students and patients were being left unattended by faculty. This admission of substandard patient care and safety is memorialized in an email dated "4/5/2017".  Despite this admission, DEFENDANTS failed to take affirmative corrective actions to protect the safety of patients.

37.      On April 7, 2017, DR. SONG complained in an email to Chancellor Hawgoods of problems of threats to patients' safety and care.  DEFENDANTS also asking DR. SONG to sign off on coding that wasn't true.  In regards to billing, DR. SONG was told that he could not change the procedure codes that were assigned in the treatment plan and to just sign them off. DR. SONG refused, advising DEFENDANTS CLEARLY: **"In regards to billing, I was told that I could not change the procedure codes that were assigned in the treatment plan and to just sign them off.  I CLEARLY stated we need to bill what was done during a patient visit irrespective of what was planned, otherwise it would be fraud.  I refused to sign off and I was told that I would get in trouble for it."**

38.      On April 10, 2017 Chancellor Hawgoods responded by email to DR. SONG, indicating that DEFENDANT DEAN  FEATHERSTONE  would get back to him regarding the complaints   and   concerns   about   patient   care   and   safety.   Neither   DEFENDANT FEATHERSTONE nor DEFENDANT BAST responded to these complaints.

COMPLAINT FOR DAMAGES

39.     On April 10, 2017, DEFENDANT BAST sent an email acknowledging DR. SONG for the first time and confirming that DR. SONG was taking off some time away from the school.

40.     On April 11, 2017, DR. SONG received notice in an email from the Pediatric Dentistry Department that he had been approved for an appointment as a professor in Pediatric Dentistry.

41.     On April 14, 2017, DEFENDANT DEAN FEATHERSTONE responded to DR. SONG, informing DR. SONG to expect a detailed response.

42.     On April 21, 2017, DR. SONG received an email from Pediatric Dentistry, stating that he needed approval from DEFENDANT DR. BAST to transfer.

43.     On May 10, 2017 DEFENDANT DEAN FEATHERSTONE demanded that DR. SONG keep quiet, and not to speak about the problems in the clinic.

44.     On June 14, 2017 DR. SONG again emailed Chancellor Hawgoods about the problems in the clinic, and complaining that DR. BAST had refused to renew his faculty appointment.

45.     DR. SONG also complained to DEFENDANTS that he was spending time re-doing entire examinations, having to teach students how to conduct an interview with a patient, when the purpose of the clinic is to teach residents how to perform surgery, not to re-teach  basic fundamentals. He was having to reteach fundamentals such as proper charting, documentation and consulting with previous providers to maintain current patients care needs and status. He explained to DEFENDANTS that he had found unsigned patients' charts, leaving no indication of who had performed the treatment, and that this created unsafe patient care because no subsequent provider would have any idea of who had done the clinical documentation. The lack

of proper documentation required DR. SONG to have to go back over the chart and re-document the treatment, wasting his time in the clinic. He also complained to DEFENDANTS that the computer system was not adequate and offered to fix it on his own time, pointing out his expertise in IT. DEFENDANTS ignored these complaints and failed to make changes to protect patient safety.

46.     DEFENDANTS blocked DR. SONG from upgrading the computer to comply with patient safety standards. The fear that patient safety was being compromised, coupled with other substandard conditions of the dental school and the lack of corrective actions from DEFENDANTS raised DR. SONG'S stress level to the point he began to fear that his dental license was in jeopardy from legal exposure for dental malpractice. DEFENDANT BAST refused to respond to DR. SONG's email complaints, and the one time DEFENDANT BAST met with DR. SONG, he told DR. SONG that he was going to change the existing policy of not competing with private practitioners in San Francisco, especially alumni. "That's all going to change", DR. BAST pointedly stated to DR. SONG. As a private practitioner and alumni, DR. SONG perceived DR. BAST'S STATEMENT as a direct threat that now the dental school was going to compete directly against him and other alumni.

47.     DR. SONG was baffled and disappointed, thinking, "Why do you think I'm the competition? I am here because I'm trying to help. So why in the world would you talk to me like this?" DR. SONG complained that he would show up at the clinic, and without any notice to him the clinic was closed after he had re-arranged his patients, causing him financial loss.

48.     DR. SONG sent an email to DR. BAST, dated April 7, 2017, expressing: "Concerns for patient safety and care, disorganized system and structure and lack of appropriate training of students". He was communicating about the inadequate dental student education,

COMPLAINT FOR DAMAGES

11

informing DR. BAST that the students were not taking care of patients appropriately. They didn't have the knowledge base, and there was inadequate training for the students. They could not even present properly to faculty. He would not feel safe having some of them graduate from dental school. DR. SONG was explaining to DR. BAST that management was ignoring basic fundamentals of pre-operative evaluations and addressing surgical concerns.

49.      DR. SONG offered solutions to enhance patient safety, even spending time remotely accessing the computer system so he could help to sign and complete charting and paperwork. DEFENDANTS denied DR. SONG'S additional requests to remotely access the computer system to remedy many of the problems in the system. The excuse for denying DR. SONG remote access was that the system cost $1200, ignoring the value of DR. SONG'S time and the fact that DR. SONG is a financial donor, donating far more on an annual basis than a mere $1200.

50.      In his email to DR. BAST, DR. SONG told DR. BAST that the teaching environment had deteriorated to the point that he needed a break because the situation had become so stressful. DR SONG feared and worried about coming in every morning because he didn't know what else could possibly go wrong, realizing that he had no support if anything were to go wrong in the clinic; that there were things he could not control. He could not control what was going on with the system, nor what was going on with the staffing and with the students. He feared that if anything were to go wrong, it was going to affect his dental license.

51.      DR. BAST and DR. FEATHERSTONE'S inaction, failures to comply with patient safety standards, their non-response and silence to his myriad of complaints regarding substandard patient care and safety left DR. SONG feeling abandoned; he no longer felt that anyone would be taking care of him at the university. This was the point when DR. SONG

decided he needed to take a break.  Threats to patients' safety and care became progressively worse after DEFENDANT BAST took over as Chair. "Things fell apart completely." DR. SONG became fearful with the way the clinic was operating, with constant threats to patient safety. He wanted take a break in an effort relay the sentiment that things urgently needed to change to protect patient care and safety.

**RETALIATION**

52.       On May 27, 2017, DEFENDANT DR. BAST sent an email response to DR. SONG, stating he was not going to renew DR. SONG'S appointment as faculty going into the 2017 academic year. DR. BAST effectively terminated DR. SONG'S faculty position because DR. SONG complained about substandard patient care and conditions of the dental school and risks to patient safety. Underscoring the lack of a business reason for terminating DR. SONG'S ten (10) year volunteer faculty professorship was DEFENDANT DR. BAST'S admission that the dental school had been operating in the negative, "in the red". It makes no sense to terminate a proven long term professor providing free time to the school, plus donating his hard earned money to the school when the school is in the red.

53.       DR. SONG was shocked when he received he DR. BAST email terminating his faculty position of ten years. DR. SONG had great student evaluations. He enjoyed teaching. He wanted to help the students and the school, his alma mater. Feeling hurt, embarrassed, humiliated, and trying to make sense of why DR. BAST was not renewing his professorship, he was left with only one conclusion: "I had made these complaints of patient safety. It upset me a lot. I never indicated that I didn't want my faculty appointment." Following DR. BAST'S retaliation by terminating DR. SONG'S faculty appointment, DR. SONG requested to be

transferred to a faculty position in the pediatrics department. As further act of illegal retaliation, DEFENDANT DR. BAST blocked DR. SONG from being transferred to pediatrics.

54.     DEFENDANTS, and each of them, caused DR. SONG to felt very upset, defeated, emotionally and mentally distressed. He had spent so much of his time giving back to the University, had complained about patient safety strictly to improve the dental school, and then, when he requested a small thing, a transfer to pediatrics, DR. BAST denied that request, ending DR. SONG'S entire academic career at UCSF. DR. SONG expresses his feelings about the personal harm to him, his reputation and career: "And it was so embarrassing that all the people who knew me in the community -- I was president of the dental society, I served in so many areas, the California Dental Association, all the colleagues in practice, they knew that I was teaching. All of the students that came through under me knew that I was a professor at UCSF. And then, all of a sudden, my intent was to transfer over to the orofacial sciences, and he just ended my professorial career at UCSF."

55.     "Members of my professional community only know I was terminated at UCSF. They don't know the issues of patient care and quality of patient safety and the conditions of the facilities I complained about to DR. BAST, DEAN FEATHERSTONE and to the chancellor. These issues were the reason DR. BAST retaliating against me by terminating my professorship, my faculty appointment, as well as blocking my request for a transfer to a pediatric appointment. And I am too embarrassed to tell my colleagues about this termination. I avoid going to dental events, fearing I will be asked why I was fired as a professor at UCSF after so many years. This is extreme humiliation."

56.  On May 31, 2017, DR. SONG emailed DEFENDANT DR. BAST, emphatically stating that he did not ask to resign his faculty appointment, contrary to the false narrative advanced by

COMPLAINT FOR DAMAGES

DEFENDANT DR. BAST, and that he wished a transfer to Pediatric Dentistry.  DR. SONG also requested a meeting with DR. BAST to discuss this issue. DEFENDANT DR. BAST refused to meet with DR. SONG.

57.  On June 15, 2017, Dr. Perkins sent out an email regarding clinic closures after DR. SONG questioned the schedule.

58.  On June 20, 2017, the residency director of Pediatric Dentistry sent DR. SONG an email stating that DR. SONG would be unable to get a primary faculty appointment unless DEFENDANT DR. BAST renewed his appointment.

59.  On  June  20,  2017,  DR.  SONG  complained  to  DEFENDANT  DEAN FEATHERSTONE  about  DR.  BAST'S  retaliation  in  deliberately  denying  his  teaching appointment. DR. SONG went to dinner on June 20, 2017 with DEFENDANT DEAN FEATHERSTONE and again raised his complaint about DR. BAST'S action of not renewing his appointment. DEFENDANT DEAN FEATHERSTONE responded by asking DR. SONG to leave the university, but offering to "be a mentor" in locating a position elsewhere. These communications are confirmed in emails.

60.  On June 22, 017, DR. SONG filed a "Retaliation or Interference Complaint" with the UCSF Department for Whistleblowers, stating: "Because of issues [patients' safety and care, substandard conditions of the dental school], I want to transfer to orofacial sciences or have my time assigned there. Instead, my position was not renewed without explanation, along with reasons not pertinent to the situation. I was told to be quiet. Extensive emails." In his Retaliation Complaint, DR. SONG named DEFENDANT BRIAN BAST as the supervisor who retaliated against him. This form was submitted to the "Whistleblower Coordinator" for UCSF. There was no effective response to his complaint.

COMPLAINT FOR DAMAGES

61.  Also on June 22, 2017, DR. SONG emailed DEFENDANT DEAN FETHERSTONE, expressing his distress and how uncomfortable he was feeling, and inquiring about the status of his requested transfer to pediatrics.

## MS. VALARIS' STATEMENT OF FACTS

### *Ms. Valaris' Background*

62.  DEFENDANTS hired MS. VALARIS as the manager of the Oral Maxillofacial Clinic on the 17th of January 2017, and DEFENDANTS wrongfully terminated her employment on the 7th of February 2017.

63.  MS. VALARIS holds two BA degrees: one in humanities and the second one in liberal arts, in labor relations and anthropology. She was hired with her expert knowledge as a certified coder in medical coding. She is also a licensed instructor through the American Academy of Professional Coders, ("AAPC"), a professional association for people working in specific areas of administration within the healthcare profession. She holds a Professional Medical Coding Curriculum ("PMCC") instructing license through the AAPC in professional medical coding.

64.  DEFENDANT BAST terminated MS. VALARIS' employment after three (3) weeks because she discovered and reported to him improper retention of patients' unpaid refunds and overpayment by the California Dental Care program that had not been refunded for periods up to five (5) years .

65.  MS. VALARIS first reported the un-refunded patients' money and government's funds to Jake Blackshear, the outgoing Manager of the OMFS, whom MS. VALARIS was replacing. He thanked her and assured her she was doing a great job, indicating that it was good she had discovered these funds and now she could correct this issue.

### *Ms. Valaris' Duties*

66.  MS. VALARIS' duties were to be the manager of the at OMFS Clinic located in the dental school known as D1201, and another clinic upstairs at 505 Parnassus where they do specialties. Additionally, she had the duty of managing another clinic at San Francisco General Hospital. When MS. VALARIS was hired on the 17th of January 2017, her assigned duties were to manage several clinic locations; to help put those clinic locations in order because Management was trying to do some renovations; to prepare the final timecards; to work on the computer system "WinOMS"; to work with the billers to make sure that they were coding correctly and were following the CMS guidelines which UCSF follows, verified through their compliance department; to attend regular meetings with the providers and to have weekly meetings with the lead staff person and staff to address any problems that were occurring.

67.  Her duties did not include discovering fraud by the university in illegally, intentionally retained, unpaid and un-refunded patients' money and money due to be returned to the State of California for over payment of Dental Care funds. This discovery was unexpected and shocking to her. As a private person and as a tax-payer she felt compelled to report this fraud to Jake Blackshear and to DEFENDANT BAST, with instructions to return the funds because five (5) years was too long a period of time for this to have been a mistake. This was intentional fraud, where the university was representing to the public that these patients and government funds were Account Receivables, falsely inflating the funds available for loans and other purposes for the university.

### *Whistleblower Re 5-7 Years Patients'And Government' Un-refunded Money*

68.  When reviewing the accounting computing system, WINOMS, for code compliance, to her shock and astonishment, MS. VALARIS discovered millions of dollars characterized as Account Receivables ("AR")| Upon further investigation and reviewing the system, she noticed

these funds were unpaid patients' monies never refunded to patients and overpayments from

California Dental Care Program that had not been refunded to the state.

69.  She had a long conversation with Jake Blackshear about these mischaracterizations of

funds, inquiring why the funds were not returned to patients and to the state. Jake Blackshear's

response was "That's one of the reasons we're glad you're here, because you'll be able to get this

cleaned up."

70. Jake admitted   in deposition testimony the UCSF Dental School has retained un-

refunded patients' and government dental excess payments:

> 23 Q. Okay. Well, tell us about that, because you're a
> 24 financial person with your master's degree in finance.
> 25 What are these credit balances, fraud instances that she
> **Page 41**
> 1 reported to you?
> 2 What does that involve?
> 3 A. So without validating whether or not it's
> 4 technically fraud, because I don't actually know the legal
> 5 policy well enough to speculate on whether or not that's
> 6 actually fraud.
> 7 Q. Yeah.
> 8 A. The situation is that when a patient comes in and
> 9 pays for a procedure, and then there is also a payment from
> 10 an insurance company, sometimes there's a double payment
> 11 and a patient will have a credit balance on their account.
> 12 Sometimes that credit balance is applied towards future
> 13 treatment; sometimes it just sits there.
> 14 And our department policy was always to send those
> 15 back to patients when they would call and ask for them.
> 16 And we from time to time would create a list of patient
> 17 accounts that needed to be cleared.
> 18 And so from time to time, that list would get
> 19 fairly long of patients that had credit balances that
> 20 needed to be refunded.
> 21 Q. M-hm. And when you say would get long, would also
> 22 get long in time that they would age?
> 23 A. Potentially, yes.

COMPLAINT FOR DAMAGES

71.  MS. VALARIS told Jake Blackshear these funds were a  problem, indicating that the university is showing AR of over a million dollars in the dental school where everything is almost all cash money coming in from the patients and from the government, State of California. Jake Blackshear admitted these funds were patients' un-refunded money and funds that rightly belonged to the government.

72. MS. VALARIS further pointed out to manager Jake Blackshear that patients were frequently asking for money due back to them, and the university was not refunding their money.

73. MS. VALARIS reported these patients and government un-refunded monies to DEFENDANT DR. BAST. He did not want to give money back and did not want to make the refunds, each time stating, "Those will have to wait." MS VALARIS pressed him about the urgency of making the refunds, emphasizing that the refunds can't wait because  if the university knows that there is a problem of un-refunded, monies there is a  certain period of time by which the university has to make refunds to the people, and especially the government. She pointed out that is a time limitation from the time of discovery and identification of the problem to the time of compliance to return the money, informing DR. BAST that these un-refunded monies had aged for up to 5 to 7 years.

74. MS. VALARIS calmly, but engagingly told DR. BAST that failure to refund the patients' and government's money was something that the university could not do. It was considered fraud.

### *Whistleblowing/ Report To Dr. Bast*

75.  MS. VALARIS was concerned that her license was on the line as the manager of the D1201. If you don't report it and you know about this fraud, it is a big problem. She felt it was

COMPLAINT FOR DAMAGES

her duty to report this fraud and insist on action to correct the problem. She told DEFENDANT BAST that she was trying to protect the university.

### Report Time Card Fraud

76.  On or about January 17th, 2017, supervisor Anna Li in the D1201 Department reported to MS. VALARIS that some employees were engaging in timecard fraud. She reported that some employees were clocking in and out on another supervisor's computer after the employee had already left the clinic. The employee would leave hours before 5 p.m. check out time, and other employees and supervisors would clock-out those "AWOL" employees.

77.  MS. VALARIS reported this time-card fraud to Jake Blackshear. He instructed MS. VALARIS to contact labor relations. MS. VALARIS also inform DR. BAST about this timecard fraud by sending his an email around January 31, 2017.

### RETALIATION: WRONGFUL TERMINATION

78.  At the end of the day, approximately 3:30, 4 o'clock, on February 7, 2017, DEFENDANT BAST sent Jake Blackshear to a meeting MS. VALARIS was holding with staff, to summon MS. VALARIS to report to his office for a meeting. Neither Jake Blackshear nor DEFENDANT BAST gave MS. VALARIS any notice as to what the meeting was going to be about.

79.  In the meeting in DR. BAST'S office, Jake Blackshear informed MS. VALARIS that her employment was terminated. DR. BAST refused to engage in any discussion about why he was firing MS. VALARIS, ignoring her repeated requests for a reason for the termination of her employment. DR. BAST refused to even talk to MS. VALARIS or answer her questions as to the termination. DEFENDANT DR. BAST also refused to provide anything in writing as to why he was terminating her employment. DEFENDANT BAST'S only response was "It would be a liability to the university if we told you."

COMPLAINT FOR DAMAGES

*Temporal Proximity In Time Of Reporting Patients Re-Fund Fraud*

80.    On or about the week January 31, 2017, during a meeting in which MS. VALARIS again raised the payment of patients' and government's un-refunded monies, DEFENDANT BAST stated: "This is something we'll talk about later." And the next morning he said to MS. VALARIS: "It's not something we're going to handle right now." The date DEFENDANT DR. BAST terminated her employment was February 7, 2017, approximately one week after she had several discussions with him about returning the monies due to patients and to the government. The fact that DEFENDANT DR. BAST terminated the employment of MS. VALARIS within one week of her report of fraud against patients and government is positive proof of illegal retaliation, especially since Jake Blackshear had assured MS. VALARIS she was doing a good job.

## DISCRIMINATION

81.  DEFENDANTS, and each of them, treated DR. SONG and MS. VALARIS differently and discriminatorily because they engaged in protected activity, including complaining about substandard patient care, patient safety, the conditions of the dental school, and un-refunded patients' and government's monies. DEFENDANTS have treated the other faculty members who did not complain about patients' safety, care and treatment more favorably than DR. SONG.

82.  Likewise, DEFENDANTS treated other employees who did not complain about fraud by the university in intentionally retaining patients' and governments' monies and refusing to refund those funds without justification more favorably than MS. VALARIS.

## FEDERAL CLAIMS

### FIRST CAUSE OF ACTION
DEPRIVATION OF FIRST AMENDMENT

COMPLAINT FOR DAMAGES

RIGHT OF FREE PUBLIC CONCERN SPEECH
IN VIOLATION OF 42 U.S.C. 1983
(**Against DEFENDANT BRIAN BAST**, *In His Individual Capacity*
*and DEFENDANT FEATHERSTONE, In His Individual Capacity*)

83. PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

84. DEFENDANTS, and each of them, retaliated against PLAINTIFFS because they exercised their First Amendment Right of Free Speech regarding public concerns. Specifically, DR. SONG complained to DEFENDANTS, their managers, agents and those in authority that the university was engaging in conduct which threatened patient care, treatment and safety. DR. SONG spoke as a private citizen and a concerned dental professional. DR. SONG's duties did not include reporting substandard patient care to management. As a direct result of DR. SONG's complaints of unsafe patient care, DEFENDANTS, and each of them, engaged in adverse employment actions, causing DR. SONG to suffer certain harms, injuries, and to be forced to endure unpleasant employment conditions and deprivation of employment benefits. DEFENDANTS retaliated against DR. SONG for engaging in speech protected by the First Amendment. That speech, he alleges, consists of protesting that the DEFENDANTS' blanket policy of failing to take corrective action to protect vulnerable, unwarned patients against negligent patient care.

85. Similarly, MS. VALARIS spoke as a private citizen and as a concerned dental professional. MS. VALARIS' duties do not include reporting to management fraud by the university regarding un-refunded patients' and government' due and owning monies. As a direct result of MS. VALARIS' complaints of unsafe patient care, DEFENDANTS, and each of them, engaged in adverse employment actions, causing MS. VALARIS to suffer certain harms, injuries, and to be forced to endure unpleasant employment conditions and deprivation of

employment benefits. DEFENDANTS retaliated against MS. VALARIS for engaging in speech protected by the First Amendment. That speech, she alleges, consists of protesting that the DEFENDANTS' blanket policy of failing to take corrective action to protect vulnerable, unwarned patients of negligent and intentional fraud by refusing to repay patients' and government's funds.

86.  "A public employer may not [take adverse action such as] discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." LeFande v. D.C., 613 F.3d 1155, 1158 (D.C. Cir. 2010) To determine whether such a violation has come to pass, the  Ninth Circuit follows the D.C. Circuit's four-part inquiry: "First, the public employee must have spoken as a citizen on a matter of public concern. Second, the court must consider whether the governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in commenting upon matters of public concern. Third, the employee must show that his speech was a substantial or motivating factor in prompting the retaliatory or punitive act. Finally, the employee must refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech."

87.  Bowie v. Maddox, 642 F.3d 1122, 1133 (D.C. Cir. 2011) (quoting Wilburn v Robinson, 480 F.3d 1140, 1149 (D.C. Cir. 2007)). "The first two inquiries are questions of law, while the last two are questions of fact usually left to the jury." Thompson, 428 F.3d at 286. At the pleading stage, however, the Complaint must still "allege[] sufficient facts for a jury to conclude" that each factor has been satisfied, see id., giving PLAINTIFFS the benefit of all reasonable inferences. See Sparrow, 216 F.3d at 1113.

88.  The first prong of the test "really imposes two requirements – that the employee speak 'as a citizen' and that the speech be 'on a matter of public concern.'" Hawkins v. D.C., 923 F. Supp. 2d 128, 137 (D.D.C. 2013). The "matter of public concern" requirement should be addressed first because "[i]f the speech is not on a matter of public concern, 'the employee has no First Amendment cause of action based on his or her employer's reaction.'" *LeFande*, 613 F.3d at 1159) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).

89.  Clearly, DR. SONG's speech regarding patient care, treatment and safety, and MS. VALARIS' complaints about unpaid refunded patients' and governments' payments all are matters of public concern. The California Labor Code reflects the public policy and public concern that the community is harmed when an employer fails to pay earned wages when due. Likewise, FEHA expressly declares that it is the public policy of California that employees work in a discrimination-free environment. Additionally, California Health and Safety Code Section 1278.5 encourages medical providers, such as DR. SONG and MS. VALARIS, to speak up to protect patients when they witness negligent and fraudulent conduct that harms or threatens to harm patients. DR. SONG's and MS. VALARIS' speech were a matter of public concern, not a matter of mere "workplace grievance[s]".The Ninth Circuit has endorsed the D.C. Circuit position refuting "the proposition that a personnel matter per se cannot be a matter of public concern." LeFande, 613 F.3d at1161. Rather, speech "relates to a matter of public concern if it is 'of political, social, or other concern to the community.'" Id. at 1159 (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)). As an example, were the head of a city department "to assert the power to fire, without process, all [its subordinate] officers, paid and unpaid, that action would 'be fairly considered as relating to [a] matter of political, social, or other concern to the community' . . . although it relates to a 'personnel matter.'" Id. at 1161.

COMPLAINT FOR DAMAGES

24

90. DR. SONG is a concerned faculty member, teacher, and compassionate medical provider who has taken an oath to "First Do No Harm". DR. SONG's speech complaining about improper patient care and negligent practices that threatened harm to patients was speech on matters of public concern. Likewise, MS. VALARIS is a licensed medial code professional, with a duty to protect the accuracy of financial billing by medical providers, engaged in speech as a matter of public concern to report five, six, seven years of un-refunded patients and government's funds that should have been refunded.

91. The next question in the analysis is whether DR. SONG and MS. VALARIS spoke "as a citizen" or, instead, "pursuant to his official duties." Garcetti, 547 U.S. at 421. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. (district attorney did not speak as private citizen when he wrote and filed memorandum that was "part of what he, as a calendar deputy, was employed to do"). The DEFENDANTS, and each of them, cannot argue, with any credibility, that DR. SONG's duties as a dentist did in any way include speaking and complaining about negligent patient care, treatment and safety or discrimination in the work place. MS. VALARIS' duties did not include searching for fraud in payments by patients and governments that were not refunded for years. Indeed, the very fact that DEFENDANTS have retaliated against DR. SONG and MS. VALARIS with adverse employment actions of terminating their employment is evidence that DEFENDANTS do not contend that DR. SONG's or MS. VALARIS' duties include speaking publicly with complaints about substandard patient care and treatment, and unpaid patients and government's monies. DR. SONG's and MS. VALARIS' speech was that of concerned private citizens, and inures to the benefit of, and was on behalf of, a class of members

in society, namely patients of dental and surgery care and treatment and tax-payers whose money pays for dental care of indigent patients, as well as accountability for safety for dental patients and financial honesty in the dental profession.

92. The second prong of the four-part inquiry requires the Court to consider whether UCSF's "interest in promoting the efficiency of the public services it performs through its employees outweighs DR. SONG's and MS. VALARIS' interest, as citizens, in commenting upon matters of public concern." Bowie, 642 F.3d at 1133. UCSF might argue it has an "interest" in promoting a harmonious work environment among faculty members and employees and can require DR. SONG and MS. VALARIS not to complain about substandard patient care and treatment or un-refunded patients' and government payments for dental services.

93. Even if Defendant UCSF asserts this position, their interest in maintaining a harmonious work environment cannot and does not outweigh DR. SONG's and MS. VALARIS' interest, as citizens, in commenting upon matters of public concern such as patient care, safety and treatment, and financial fraud by the university. Defendant UCSF's interest, whatever it may be, has no bearing on DR. SONG's and MS. VALARIS' First Amendment Right and interest as citizens "in commenting upon matters of public concern." Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968) (emphasis added). UCSF interest as just as it was in Pickering, supra: "Here, the employer's side of the Pickering scale is entirely empty," Lane v. Franks, 134 S. Ct. 2369, 2381 (2014). DEFENDANTS' actions in retaliating against DR. SONG because of his speech complaints of patients safety, care, and substandard conditions of the dental school "was a substantial or motivating factor in prompting the retaliatory or punitive act[s]." Bowie, 642 F.3d at 1133.

94.  Finally, DEFENDANTS will be unable to credibly argue that they would have reached the same decision of terminating the employment of DR. SONG and MS. VALARIS, absence of his protected speech protesting these violations. Thus, DR. SONG and MS. VALARIS assert a sustainable cause of action for retaliation for exercising their First Amendment Right to speak about matters of public concern.

95.  DEFENDANTS' retaliation against DR. SONG for speaking up and protesting the violations of his constitutional rights is a violation of his right of free speech in the public interest. DEFENDANTS' illegal conduct entitles DR. SONG to all damages incurred as herein alleged.

Wherefore, PLAINTIFFS pray for judgment as more fully set forth below.


**SECOND CAUSE OF ACTION**
RETALIATION IN VIOLATION OF CIVIL RIGHTS
**(42 U.S.C. § 1983)**
**(Against DR. FEATHERSTONE,** *In His Individual Capacity,*
**DR. BRIAN BAST**, *In His Individual Capacity***)**

96.  PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

97.  Federal Civil Rights Law 42. U.S.C. §1983 provides in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress".

98.  DEFENDANTS' actions and failures, as alleged, constitute a pattern, practice, and custom of violations of the Civil Rights Laws of the United States, 42 U.S.C § 1983.

COMPLAINT FOR DAMAGES

DEFENDANTS, while acting under color of state authority and law, wrongfully and intentionally retaliated against DR. SONG and MS. VALARIS by terminating their employment because they exercised their First Amendment right under the United States Constitution of Free Speech by making a complaint to their employer. In the case of DR. SONG to the university's whistleblower complaint department and to supervisor, DEFENDANT DR. BAST, concerning patient care and safety at UCSF, and in the case of MS. VALARIS, concerning fraud in refunding patients' and government's dental payments.

99. DEFENDANTS' conduct, as set forth above, constitutes violations, under color of law, of PLAINTIFFS' rights, privileges, and immunities guaranteed to them by the First Amendment of the United Stated Constitution of free speech and to petition the government for redress of grievances. Further, DEFENDANTS' conduct violated DR. SONG'S and MS. VALARIS' Fourteenth Amendment right of Liberty by retaliating against them and thereby by restricting and curtailing their right to be free of unconstitutional retaliatory conduct.

### *Defendants Engaged In A Pattern And Practice, Policy And Custom Of Retaliation*

100. DR. BAST has a proclivity, propensity and predictable practice and custom of striking out against any employee who complains about the patient care, substandard conditions of the facilities, illegal management practices, time card fraud, and other egregious illegal conduct in his administration as Department Chair and managing agent of Defendant UCSF Department of Oral & Maxillofacial Surgery. Evidence adduced is overwhelming of this violation of 42 U.S.C Section 1983 not only against DR. SONG and MS. VALARIS, but also against many other medical providers, employees and managers.

### *Other Suffering Victims in Wake of Dr. Bast's Illegal Retaliation*

COMPLAINT FOR DAMAGES

**1. DR. HIEU PHAM**

101. DR. PHAM met with DEFENDANT DR. BAST in his office on Wednesday, January 27, 2016, in order to inform him that the department has been underpaying him even though he brings in the highest clinical income in the department. DR. PHAM asked DEFENDANT DR. BAST to honor the contract DR. PHAM has had with the department since July 1, 2004. The agreement DR. PHAM had with the department is to provide 2 days of patient care. In return, the department will pay him 50% of the highest senior dentist salary scale with full benefits. DR. PHAM's salary, benefits and expenses are paid by the clinical income DR. PHAM generates from patient care.

102. On May 18, 2016, Dr. Derek Park, Dr. Chirag Patel and DR. PHAM met with DEFENDANT DR. BAST and raised serious concerns about substandard patient care being rendered by a white female surgeon, Dr. P. They expressed to DEFENDANT DR. BAST that Oral Surgeons are being scrutinized for their ability to safely provide anesthesia and operate simultaneously after two anesthetic related deaths occurred in the last two (2) years in the San Francisco Bay Area. They expressed to DEFENDANT DR. BAST that oral surgeons must police themselves and protect the public from incompetent surgeons.

103. DEFENDANT DR. BAST expressed antagonism toward the Doctors who complained about Dr. P., and he exhibited extreme hostility against DR. PHAM for bring these patient safety issues to his attention. Despite all these serious incidents, DEFENDANT DR. BAST insisted that she was a good surgeon, falsely accusing DR. PHAM of orchestrating all these negative complaints against her.

104. Even though DR. PHAM was working two days of direct patient care a week and a half-day of administration duties (fulfilling a 50% work appointment), as well as providing additional off-hour contact information for his patients, on April 4, 2017, DR. PHAM received a

letter from Cecelia Lucero, Human Resource Generalist of UCSF Human Resources Department

stating the following changes to DR. PHAM's appointment:

> 'This letter is to notify you that as previously informed, your Senior Dentist (Title Code 0774) position is being reduced from 50% to 40% effective March 27, 2017.
> …eligible employees whose appointment is reduced below 50% no longer accrue vacation or sick leave. Therefore, you will stop accruing vacation and sick leave hours as of March 27, 2017."

2. <u>DEPOSITION OF ANNAMARIE ABRANTES-LI  FEBRUARY 11, 2019</u>

105.      Defendant DR. BAST Would Not Allow 17 Year Tenured Manager To Return To

The Clinic Following Stress Leave After She Reported Time Card Fraud And Forced Her Into

Early Retirement.

> 12 Q. Did you work at UCSF for a while?
> 13 A. Yes, I did.
> 14 Q. For how long?
> 15 A. I worked at UCSF for about 17 years.
> 22 Q. We just had a deposition with a Ms. Tina
> 23 Valarez (phonetic).
> 24 Do you know Tina?
> 25 A. Yes.
> Page 5
> 1 Q. And she told us that you had brought some
> 2 issue of time card fraud to her by some of the
> 3 coworkers?
> 4 A. Yes.
> 5 Q. And you did do that?
> 6 A. Yes.
> 9 Q. Were you subjected to any kind of complaints
> 10 against you following your reporting this time card
> 11 fraud?
> 13 THE WITNESS: Yes.
> 18 Q. -- do you believe that these complaints
> 19 against you were a part of retaliation because you
> 20 brought up the time card fraud?
> 21 A. Yes.
> Page 11
> 3 Q. Okay. And so did you believe -- first of all,
> 4 did Dr. Bast ever have any discussion with you about

5 your report to him of this time card fraud?

6 A. No. He did not discuss anything with me.

7 Q. Did he say he was going to go and correct the

8 problem to the --

9 A. No.

The staff should not

12 see you, so don't go inside the clinic until Dr. Bast

13 talks to you.

14 I said, What did I do wrong? I didn't do

15 anything wrong. Why would I not step inside the clinic?

16 So I went home. I was, like, pondering over it. What

17 should I do? Things like that. Should I really just

18 retire?

So they said, Wait for

12 Dr. Bast. He's in San Francisco General.

13 I drove around the avenue, waiting for

14 Dr. Bast -- to hear from Dr. Bast to say, I'm ready to

15 talk to you.

16 Q. Because you couldn't go into the clinic?

17 A. Yes. But I never got -- I never heard from

18 Dr. Bast, so they sent me home again.

19 Q. "They," you mean?

20 A. Bradley Spur and Joe Sorrano.

21 Q. And Joe Sorrano had replaced Tina?

22 A. Interim, yes.

23 Q. And how long did you drive around on the

24 avenue waiting for Dr. Bast?

25 A. I couldn't remember now. It may have been an

Page 26

1 hour or two, driving around the avenue.

2 Q. And while you were driving around, how did you

3 feel?

4 A. Terrible.

5 Q. Did Dr. Bast ever meet with you?

6 A. Not on that day.

7 Q. Did he meet with you at any time?

8 A. No.

8 Q. And "they," being Joe Sorrano and Bradley

9 Spur.

10 Did Dr. Bast ever tell you not no go back in?

11 A. They were telling me that this was an

12 instruction from Dr. Bast.

5 Q. Going back to Exhibit 1, could you read the

COMPLAINT FOR DAMAGES

6 last sentence?
7 A. "The emotional distress and mental torture,
8 how I can describe it. It was -- this was so traumatic
9 for me that I had to go into therapy to finally decide
10 on an early retirement. Emotional distress and mental
11 torture, how I can describe it?"
12 Q. That's what it felt like, mental torture?
13 A. Yes.

   3.      DEPOSITION OF MARK A. CRANE, DDS, MD JANUARY 30, 2019

   106. Defendant Dr. Bast "fabricated a story" against Dr. Crane involving a patient when Dr.

Crane was out on Paternity leave as a means to deny his merit application for a position, and

instead appointing Dr. P in violation of the merit rules.


   3 Q. So you've been a volunteer faculty member from 2000
   4 or 2001?
   5 A. 2001. So my appointment at UC ended in 2000, and
   6 then I came back in 2001 as a volunteer faculty.
   Page 5
   11 Q. Now, is it your general understanding that UCSF has
   12 a merit system base, where the position has to be
   13 advertised and there has to be some kind of competitive
   14 process, including an interview and evaluation, before a
   15 position is filled?

   18 THE WITNESS: The University has pretty specific
   19 rules. And a general position that doesn't fill a
   20 specific, unique need with somebody who is specifically
   21 qualified for that position has to go through a general
   22 search, a minimum of, I believe it's one month --
   Q. So is it your understanding that Dr. Bast appointed
   7 Dr. Perkins without this competitive vetting process?
   10 THE WITNESS: I know that Dr. Bast is the acting
   11 chair and had appointed her. As I said, I'm not aware if
   12 there was an impaneled search committee and the standard
   13 was followed.
   11 Q. Okay. And what did Dr. Bast say in that document?
   Page 22
   4 After
   5 "…careful consideration you have not been selected to
   6 fill this position. Your qualifications are
   7 excellent and I encourage you to apply for future
   8 academic positions within the Department of Oral

COMPLAINT FOR DAMAGES

9 and Maxillofacial Surgery.
10 Sincerely yours, Brian Bast."
11 Q. Okay. Did you write any response to him at all to
12 that
Q. Okay. And what did Dr. Bast say in that document?

Page 22
4 After
5 "…careful consideration you have not been selected to
6 fill this position. Your qualifications are
7 excellent and I encourage you to apply for future
8 academic positions within the Department of Oral
9 and Maxillofacial Surgery.
10 Sincerely yours, Brian Bast."
11 Q. Okay. Did you write any response to him at all to
12 that particular October 2nd, '17 --
13 A. I just read this on Friday..
10 THE WITNESS: But there is a thread of a number of
11 communications with Cheryl Addleman, who is the
12 investigation specialist for the Office of Ethics and
13 Compliance, and she was involved in the investigation –
–articular October 2nd, '17 --
13 A. I just read this on Friday.

10 THE WITNESS: But there is a thread of a number of
11 communications with Cheryl Addleman, who is the
12 investigation specialist for the Office of Ethics and
13 Compliance, and she was involved in the investigation -
Q. And what did she say in the communication to you?
19 A. After she had interviewed Dr. Bast, she sends --
20 this is March 9th, 2018.
21 Q. Okay.
22 A. Months ago.
23 "Dr. Crane, one final question. Do you recall
24 a time when you were a UCSF Senior Resident and
25 Dr. Bast had just started his residency? It
Page 29
1 was at SFGH, fourth of July weekend; Dr. Bast
2 was on duty, you were on-call and it had to do
3 with a patient that came in that had been shot
4 in the face. Whatever information you can
5 recall or provide would be helpful."
9 THE WITNESS: I responded on the 10th, "No," but I
10 was out of town. So I responded no and then when I got
11 back to town later that day, I said:
12 "Hi Ms. Addleman. Back in town and checked my case
13 notes. I find no operation report of a facial

COMPLAINT FOR DAMAGES

> 14 gunshot patient in July 1997. Further, I have no
> 15 recollection of such a case; yet, since gun
> 16 injuries were uncommon in San Francisco then, I
> 17 think I would remember it.
> 19 "Can you give me more details? Then, perhaps, I
> 20 can corroborate the issue or refute it as yet
> 21 another tiresome fabrication."

107. DEFENDANTS' actions have caused and continue to cause PLAINTIFFS substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other benefits, lost wages, attorneys' fees, medical expenses, loss of future earnings and benefits, cost of suit, humiliation, embarrassment and anguish, all to their damage in an amount according to proof.

108. As to DEFENDANTS DR. BAST and DR. FEATHERSTONE, the acts of these DEFENDANTS, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure DR. SONG and MS. VALARIS and to cause each PLAINTIFF mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANT DR. BAST and DEFENDANT DR. FEATHERSTONE only.

Wherefore, PLAINTIFFS pray for judgment as more fully set forth below.

### THIRD CAUSE OF ACTION
DEPRIVATION OF PROPERTY AND DUE PROCESS
IN VIOLATION OF FOURTEENTH AMENDMENT
42 U.S.C. § 1983
**(Against DR. FEATHERSTONE and DR. BRIAN BAST**
*In Their Individual Capacity*)

109. PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

COMPLAINT FOR DAMAGES

110. DEFENDANTS DR. FEATHERSTONE and DR. BAST are the final authority and final decision makers for DEFENDANT UCSF. DEFENDANT DR. BAST and DEFENDANT DR. FEATHERSTONE, while acting under color of state authority and law, wrongfully and intentionally deprived DR. SONG of his Professor Appointment and faculty position, his property, in violation of DR. SONG's Fourteenth Amendment Rights under the United States Constitution.

111. DEFENDANTS DR. FEATHERSTONE and DR. BAST are the final authority and final decision makers for DEFENDANT UCSF. DEFENDANT DR. BAST and DEFENDANT DR. FEATHERSTONE, while acting under color of state authority and law, wrongfully and intentionally deprived MS. VALARIS of her job as manager of the OMFS clinic, the income derived therefrom constituting her property, in violation of MS. VALARIS' Fourteenth Amendment Rights under the United States Constitution.

112. DEFENDANTS' conduct, as set forth above, constitutes violations, under color of law, of PLAINTIFFS' rights, privileges, and immunities guaranteed to them by the Fourteenth Amendment of the United Stated Constitution. Further, DEFENDANTS' conduct violated DR. SONG's Fourteenth Amendment right of Due Process by depriving DR. SONG of his property, his Professor Appointment and faculty position with UCSF without due process of law. Further, DEFENDANTS' conduct violated MS. VARALIS' Fourteenth Amendment right of Due Process by depriving her of her property, her position as a manager and her wages derived therefrom without due process of law.

113. DEFENDANTS' actions have caused and continue to cause PLAINTIFFS substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, loss

of future earnings and benefits, cost of suit, humiliation, embarrassment and anguish, all to their damage in an amount according to proof.

114. As to DEFENDANT DR. FEATHERSTONE and DEFENDANT DR. BAST only, the acts of these DEFENDANTS, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure DR. SONG and to cause him mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and  malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANT DR. FEATHERSTONE and DEFENDANT DR. BAST.

 Wherefore, PLAINTIFFS pray for judgment as more fully set forth below.

## STATE CLAIMS

### FOURTH CAUSE OF ACTION
VIOLATION CALIFORNIA LABOR CODE SECTION 1102.5
**(Against Defendant Employer UCSF)**

115. PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

116. DEFENDANT UCSF took adverse employment action against DR. SONG and MS. VALARIS in violation of California Labor Code Section 1102.5 by retaliating against DR. SONG for engaging in statutorily protected activity. PLAINTIFFS' protected activity included, but is not limited to, the following: complaining to DR. BAST, DR. FEATHERSTONE and Jake Blackshear about substandard patients' care, conditions of the dental school and patients' safety and fraud by the university in refusing to refund over payment of patients' and governments' excess payments for dental care and as a direct and legal result of DEFENDANTS' illegal and

retaliatory conduct, as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial economic and non-economic damage, in an amount according to proof.

Wherefore, PLAINTIFFS pray for judgment as more fully set forth below.

### FIFTH CAUSE OF ACTION
RETALIATION IN VIOLATION OF
HEALTH & SAFETY CODE SECTION 1278.5
**(Against Defendant UCSF)**

117. PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

118. California Health & Safety Code Section 1278.5 states: "No health facility shall discriminate or retaliate, in any manner, against any patient, employee, member of the medical staff, or any other health care worker of the health facility because that person has done either of the following: (A) Presented a grievance, complaint, or report to the facility, to an entity or agency responsible for accrediting or evaluating the facility, or the medical staff of the facility, or to any other governmental entity. (B) Has initiated, participated, or cooperated in an investigation or administrative proceeding related to, the quality of care, services, or conditions at the facility that is carried out by an entity or agency responsible for accrediting or evaluating the facility or its medical staff, or governmental entity. (2) No entity that owns or operates a health facility, or which owns or operates any other health facility, shall discriminate or retaliate against any person because that person has taken any actions pursuant to this subdivision."

119. From 2015 through his wrongful employment termination, DR. SONG and other doctors provided DEFENDANT DR. BAST with a detailed description of substandard patient care and treatment. In his complaint, DR. SONG provided facts concerning substandard patient care and safety to the administration and supervisors.

120. MS. VALARIS also provided DEFENDANT BAST with solid evidence of over payments of dental care money, which under law should have been refunded to patients or to the government for dental care payments.

121. DEFENDANTS retaliated against DR. SONG and MS. VALARIS by terminating their employment.

122. DEFENDANT UCSF, through its managing agents at UCSF, retaliated against DR. SONG and MS. VALARIS for engaging in a protected activity. This adverse employment action was a direct result of DR. SONG'S and MS. VALARIS' protected activity and is therefore retaliation.

123. DEFENDANTS' actions of retaliation against DR. SONG and MS. VALARIS in the terms, conditions and benefits of their employment have caused and continue to cause them substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, loss of future earnings and benefits, cost of suit, humiliation, embarrassment and anguish, all to their damage in an amount according to proof.

Wherefore, PLAINTIFFS pray for judgment as more fully set forth below.

### SIXTH CAUSE OF ACTION
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**(Against DR. BAST and Dr. FEATHERSTONE)**

124. PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

125. DEFENDANT DR. BAST AND DR. FEATHERSTONE engaged in extreme and outrageous conduct by retaliating against DR. SONG and MS. VALARIS for their participation in a statutorily protected activity, including complaining about patient care and safety and fraud by UCSF intentionally retaining, converting, and embezzling patients and governments' un-

refunded monies for dental care. DEFENDANTS' illegal retaliation infringed on PLAINTIFFS' exercise of their United States Constitution First and Fourteenth Amendments rights of Free Speech and Liberty.  DEFENDANTS' conduct violates public policy as such and should not be tolerated in a civilized society.

126. DEFENDANTS' conduct was intentional and caused DR. SONG and MS. VALARIS to suffer severe emotional distress. As to DEFENDANT DR. BAST AND DR. FEATHERSTONE only, the acts of these DEFENDANTS, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure DR. SONG and to cause him mental anguish, anxiety, and distress.  DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to DR. SONG and MS. VALARIS and were a substantial factor in causing harm, damage, and injuries and committed with the intent to injure, constitution oppression, fraud, and malice under California Civil Code §3294, entitling  PLAINTIFFS to punitive damages against these DEFENDANTS only.

Wherefore, PLAINTIFFS pray for judgment as more fully set forth below.

### SEVENTH CAUSE OF ACTION
NEGLIGENCE GOVERNMENT CODE SECTION 815.2
**(Against Defendant Employer)**

127. PLAINTIFFS  incorporate  by  reference  herein  the  preceding  paragraphs  of  the complaint as though set forth here in full.

128. California Government Code Section 815.2.  (a) provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."

129. DEFENDANT DR. BAST and DR. FEATHERSTONE owed a duty of care to DR. SONG and to MS. VALARIS to conduct themselves so as to avoid risk of injury to them.

COMPLAINT FOR DAMAGES

DEFENDANTS BAST and FEATERSTONE breached their duty to DR. SONG and MS. VALARIS by terminating PLAINTIFFS' employment. DEFENDANT DR. BAST and DEFENDANT FEATHERSTONE breached this duty, and were negligent.

130. As a direct and legal result of DEFENDANTS ' negligence as set forth herein, PLAINTIFFS have suffered and continues to suffer substantial economic and non-economic damage in an amount according to proof.

Wherefore, PLAINTIFFS pray for judgment as more fully set forth below.

## PUNITIVE DAMAGES

131. DEFENDANTS DR. FEATHERSTONE and DR. BAST'S acts, as alleged herein, as to all causes of action, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure DR. SONG and MS. VALARIS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against individual DEFENDANTS only.

## PRAYER FOR RELIEF

132. Wherefore, PLAINTIFFS pray for judgment against DEFENDANTS, and each of them as follows:

1.  For general damages in an amount according to proof;

2.  For special damages in an amount according to proof;

3.  For prejudgment interest in an amount according to proof;

4.  For reasonable attorney's fees and cost of suit therein required by statute;

COMPLAINT FOR DAMAGES

5.    For punitive damages in the amount of $3,000,000.00 each as to DEFENDANT DR. FEATHERSTONE and DEFENDANT DR. BAST, or 9% of the net worth of each DEFENDANT, whichever is greater.

6.    For statutory penalties and any other statutory relief;

7.    For $3,000,000.00 in compensatory damages, past and further, including physical injuries creating mental and emotional misery;

8.    For such other and further relief as the court may deem proper;

9.    PLAINTIFFS hereby demand a trial by jury.

**JURY TRIAL DEMANDED**

DATED: May 20, 2019                RESPECTFULLY SUBMITTED
                                   **LAW OFFICES OF BONNER & BONNER**


                                   _/s/ Charles A. Bonner_____
                                   ATTORNEY FOR PLAINTIFFS